# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

———————————————

No. 1D2024-1929

———————————————

NATIONAL ASSISTED LIVING RISK
RETENTION GROUP,

    Appellant,

    v.

HENRY WALTON BISHOP, III,
individually, and as the
Personal Representative of the
Estate of Henry Walton Bishop,
Jr., Deceased, for and on behalf
of said Estate and the survivors
thereof, J & S ASSISTED LIVING
AND CONSULTANT LLC, a Florida
limited liability company;
RICHARD MARSHALL,
individually; and SABRINA
MARSHALL, individually,

    Appellees.

———————————————

On appeal from the Circuit Court for Hamilton County.
Fred L. Koberlein, Jr., Judge.

August 5, 2026

ROWE, J.

    National Assisted Living Risk Retention Group (NALRRG) appeals a final judgment following proceedings supplementary by

the Estate of Henry Walton Bishop Jr. (the Estate). The Estate sued J&S Assisted Living & Consultant LLC (J&S) for the wrongful death of Bishop. After a trial, the court entered a $20 million judgment for the Estate. The Estate was then assigned J&S's rights, interests, and claims under a 2012 insurance policy issued by NALRRG. The Estate sued NALRRG for breach of contract for denying coverage and refusing to defend J&S in the wrongful death action. After a bench trial, the court entered judgment for the Estate. NALRRG asserts that the trial court reversibly erred in finding that coverage existed under the 2012 policy assigned to the Estate because J&S never made a claim under that policy. We agree and reverse.

*Bishop's Death*

In 2011, the Department of Children and Families (DCF) was called to check on the welfare of Henry Walton Bishop Jr. (Bishop), an 87-year-old man living alone in a motel room. Based on Bishop's condition—he was unsteady on his feet, fell frequently, and became disoriented and delusional—DCF obtained an order declaring Bishop to be a vulnerable adult in need of protective services. DCF then placed Bishop in an assisted living facility owned and operated by J&S. On July 9, 2012, Bishop wandered away from J&S's facility unsupervised and was walking to a nearby convenience store. When he tried to cross a busy intersection, he was struck by a logging truck. Bishop was pronounced dead at the scene. Florida Highway Patrol (FHP) investigated the accident and found that the driver was not at fault.

After Bishop's death, state agencies, including FHP, DCF, and the Agency for Healthcare Administration (AHCA), opened criminal and regulatory investigations. As part of their investigations, the agencies confirmed that J&S maintained the statutorily required insurance. Richard Marshall, the facility manager for J&S, called Carmona Insurance Group (Carmona), an insurance agent, to report Bishop's death and the ongoing investigations. At that time, no one had advised Marshall or J&S that they intended to sue or seek compensation for damages arising from Bishop's death. Carmona's agent told Marshall to call

back if any lawsuits were filed or charges were brought against J&S.

*Insurance Policies*

As it relates to this case, J&S obtained three insurance policies from NALRRG. Other than the effective date and retroactive date, the policies were materially the same. Each policy provided two forms of coverage: commercial general liability (CGL) and professional liability (PL). CGL coverage applied to "occurrences" that happened in the coverage territory during the policy period. PL coverage applied to incidents that happened within the coverage territory during the policy period.

Each form of coverage also offered J&S the option to secure supplemental extended discovery periods, also known as tail coverage, to cover claims made for incidents that happened between the retroactive date and the end of the policy period but that were not presented until after the policy period. *See Arad v. Caduceus Self Ins. Fund, Inc.*, 585 So. 2d 1000, 1001 (Fla. 4th DCA 1991). In other words, rather than requiring an insured to report a claim for an incident that occurred during the policy period, within that same policy period, tail coverage allows an insured to report a claim—under a new policy—on a date after the expiration date of the policy in effect when the incident occurred. *First Pros. Ins. Co., Inc. v. McKinney*, 973 So. 2d 510, 515 (Fla. 1st DCA 2007).

*2012 Policy*

At the time of the incident, J&S was insured under a policy from NALRRG that was in effect from January 13, 2012, until January 13, 2013 (the 2012 policy), with a retroactive date of January 13, 2012. J&S bought the 2012 policy through DAB Premium Finance, LLC. (DAB), which gave DAB the authority to cancel the policy for nonpayment.

On December 13, 2012, NALRRG sent a letter to J&S notifying it that the 2012 policy had been cancelled because DAB reported that J&S failed to pay its premiums. The notice stated that the policy would be cancelled retroactively as of August 30, 2012. But NALRRG also advised J&S that it had the option of purchasing supplemental extended discovery coverage before

3

October 30, 2012, to extend the reporting period for claims that happened during the 2012 policy term. A second notice was sent on the same day also informing J&S that its 2012 policy would be retroactively cancelled as of August 30, 2012, due to DAB advising that J&S failed to pay its premiums. But this notice said that until February 11, 2013, J&S could purchase supplemental extended discovery coverage. Even so, there is no indication in the record that J&S made any effort to contact NALRRG or Carmona to buy the offered supplemental coverage.

*November 2012 Renewal Letter and the 2013 Policy*

In November 2012, NALRRG sent a letter to J&S, advising that the 2012 policy would expire on January 13, 2013, and offering to renew their policy for a new term. The renewal letter advised J&S that if NALRRG did not receive J&S's application and renewal premium payment before January 13, 2013, coverage would lapse and J&S would then "have no coverage for claims resulting from an injury or incident which occurred after the expiration date." There is no evidence that Marshall ever tried to contact NALRRG or Carmona to renew the policy before that date.

Instead, J&S did not apply for the renewal policy or pay a renewal premium until March 2013. J&S financed the premium with a different premium finance company. The 2013 policy was issued on March 8, 2013, and had a retroactive date of March 8, 2013. This created a gap in coverage from the date of cancellation of the 2012 policy (August 30, 2012) until the new policy was secured (March 8, 2013). Because of this gap, any claims made under the 2013 policy had to be tied to injuries or occurrences happening on or after March 8, 2013.

*2014 Policy*

J&S renewed its policy with NALRRG in 2014. J&S financed the renewal premium with yet another premium finance company. The 2014 policy had a retroactive date of March 8, 2013. This allowed J&S to report claims during the 2014 policy period (March 8, 2014, through March 8, 2015) for incidents or occurrences happening on or after March 8, 2013.

4

*Wrongful Death Suit*

Although Bishop died in July 2012, J&S did not receive any demand for damages or notice of a lawsuit until two years later. In 2014, the Estate filed a wrongful death action against J&S and Marshall. J&S and Marshall reported the lawsuit to Carmona and claimed coverage under J&S's insurance policy with NALRRG. A third-party claims administrator denied coverage, concluding that the claim made under the 2014 policy was for an incident (Bishop's death) that occurred before the retroactive date for reporting claims under the policy. NALRRG thus declined to represent J&S in the wrongful death action.

After discovery, the Estate moved for partial summary judgment. The trial court granted the motion, finding that J&S was liable for Bishop's death. In 2018, after a bench trial on damages, where J&S appeared without counsel, the court entered a judgment for the Estate for $20 million in damages. The trial court made a special finding that J&S and Marshall were jointly and severally liable for Bishop's death as the direct result of their willful and malicious acts and omissions.

*Proceedings Supplementary*

J&S and Marshall failed to satisfy the $20 million judgment. In May 2021, the Estate moved to begin proceedings supplementary against NALRRG under Florida Rule of Civil Procedure 1.570 and section 56.29, Florida Statutes. The Estate moved for an assignment of the rights and interests of Marshall and J&S under the 2012 policy with NALRRG. The Estate attached to the motion a copy of only the 2012 policy. The court granted the motion.

After several amendments, the Estate filed a second amended complaint against NALRRG. The complaint included four counts: (1 and 2) breach of the 2012 policy when NALRRG denied coverage to J&S and Marshall; (3) reformation of the 2013 and 2014 policies, and (4) equitable estoppel. NALRRG moved to dismiss counts three and four because the Estate never sought or received an assignment of rights as to the 2013 and 2014 policies. And the trial court had allowed proceedings supplementary against NALRRG

5

only as to the 2012 policy. In 2024, three days before trial, the Estate voluntarily withdrew those counts. The Estate proceeded to a bench trial on the two breach of contract counts addressing the 2012 policy.

*Final Judgment*

After considering depositions of several witnesses, the insurance policies, the November 2012 renewal notice, and the December 2012 cancellation notices, the trial court concluded that NALRRG breached the 2012 insurance policy when it failed to defend J&S and provide coverage for the Estate's wrongful death claim. The court found that Marshall's call to Carmona in November 2012 amounted to notice of a claim under the policy. The trial court then found that a claim on behalf of the insured had been made based on the court's finding that a government agency had inquired whether J&S maintained the statutorily-required insurance coverage.

As for the retroactive cancellation of the 2012 policy, the trial court found that NALRRG failed to show that J&S did not pay its premiums for the 2012 policy or that the financing company, DAB, reported to NALRRG that J&S failed to make the payments. The court concluded that the Estate was entitled to the policy limits of $50,000 because the amount of the wrongful death verdict exceeded those limits. The court reserved jurisdiction to allow the Estate to amend its pleadings to assert a bad faith claim against NALRRG. This timely appeal follows.

*Standard of Review*

Our interpretation of an insurance policy is a question of law subject to de novo review. *See Gov't Emps. Ins. Co. v. Macedo*, 228 So. 3d 1111, 1113 (Fla. 2017). We consider the terms of the insurance contract based on its plain language. *Id.* "[A]ny ambiguity which remains after reading each policy as a whole and endeavoring to give every provision its full meaning and operative effect must be liberally construed in favor of coverage and strictly against the insurer." *Id.* (quoting *Wash. Nat'l Ins. Corp. v. Ruderman*, 117 So. 3d 943, 949–50 (Fla. 2013)). A provision in an insurance policy is considered ambiguous when it is "susceptible to

6

two reasonable interpretations, one providing coverage and the other excluding coverage." *Id.* (quoting *Fayad v. Clarendon Nat'l Ins. Co.*, 899 So. 2d 1082, 1086 (Fla. 2005)).

We also review de novo a trial court's determination of whether an insurer is required to provide coverage. *State Farm Mut. Auto. Ins. Co. v. Mashburn*, 15 So. 3d 701, 704 (Fla. 1st DCA 2009). We read insurance policies as a whole and attempt to give every provision its full meaning and operative effect. *Id.* Finally, the trial court's factual findings must be supported by competent, substantial evidence. *MTGLQ Invs., L.P. v. Moore*, 293 So. 3d 610, 615 (Fla. 1st DCA 2020).

*Analysis*

NALRRG argues that the trial court reversibly erred when it found that a claim was made under the 2012 policy[1] and that NALRRG breached its contract when it denied coverage to J&S and Marshall in the 2014 wrongful death action. Specifically, NALRRG argues that the trial court erred when it concluded that J&S's November 2012 phone call to Carmona[2] reporting Bishop's death and the investigations by Florida's agencies amounted to a claim under the 2012 policy. We agree.

First, we consider the nature of J&S's policy with NALRRG— was it an occurrence-based or claims-made policy? "An occurrence policy is a policy in which the coverage is effective if the negligent act or omission occurs within the policy period, regardless of the date of discovery or the date the claim is made or asserted." *Gulf Ins. Co. v. Dolan, Fertig & Curtis*, 433 So. 2d 512, 514 (Fla. 1983). In contrast, claims-made policies cover claims made during the policy period arising out of incidents that happened during the

---

[1] The Estate's assignment of rights in the proceedings supplementary was limited to the 2012 policy. For this reason, this is the only insurance policy at issue in this appeal.

[2] Although contested below, NALRRG never argues on appeal that Carmona was not its statutory agent for the purposes of claims reporting.

policy period. *First Pros. Ins. Co., Inc.*, 973 So. 2d at 515. The policy issued by NALRRG stated in bold print at the top of the declarations page that it was a claims-made policy. The same statement in the same bold print also appears on the first page of the CGL part and PL part of the policy. Thus, by its express and unambiguous terms, the 2012 policy is a claims-made policy.

Second, we turn to whether J&S or Marshall made a claim—as that term is defined in the 2012 policy—within the time period covered by the policy. "Like other contracts, contracts of insurance should receive a construction that is reasonable, practical, sensible, and just." *Id.* at 514 (quoting *Gen. Star Indem. Co. v. W. Fla. Vill. Inn, Inc.,* 874 So. 2d 26, 29 (Fla. 2d DCA 2004). And they should be interpreted according to their plain language. *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000).

To obtain CGL or PL coverage for a claim under its 2012 policy with NALRRG, the following conditions had to be satisfied:

1. The injury [was] caused by an "medical incident" that [took] place in the "coverage territory";

2. The "medical incident" did not occur before the Retroactive Date shown in the Declarations or after the end of the policy period; and

3. A "claim" for damages, with respect to the injury, [was] first made against any insured . . . during the policy period or an Extended Discovery Period . . . .

Each form of coverage contains its own definitions for a "claim":

| Commercial General Liability Coverage | Professional Liability Coverage |
|---|---|
| 4. "Claim" means a "suit" or demand for monetary damages or services because of "bodily injury" "property damage" or "personal and advertising injury". | 4. "Claim" means a "suit" or demand made by or for the injured person for monetary damages services because of alleged injury to which thi insurance applies. |

8

| | |
|---|---|
| 21. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:<br>a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or<br>b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent. | 14. "Suit" means a civil proceeding in which damages because of injury to which this insurance applies are alleged. "Suit" includes:<br>a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with o consent; or<br>b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with out consent. |

Under either definition, a "claim" is not defined as when an injury happens. Rather, it is when a demand for monetary damages or services is made because of an injury. The focus of a claims-made policy is to provide notice to the insurer within the policy period. *Gulf Ins. Co.*, 433 So. 2d at 514. In other words, "[i]f the claim is reported to the insurer during the policy period, then the carrier is legally obligated to pay; if the claim is not reported during the policy period, no liability attaches." *Id.* at 515. Here, notice of a claim could not have been made during the period the 2012 policy was in effect because the Estate's wrongful death suit was not filed until 2014—long after the 2012 policy expired.

It is important to distinguish between the notice of an injury or occurrence that happened during the policy period that may lead to a claim under the policy, versus notice of a claim made under the policy arising out of that incident or occurrence. The PL portion provides:

It is hereby agreed and understood that "medical incident" means any act or omission **occurring during the policy period**:

a. In the providing of or failure to provide professional health care, nursing care or long term care services to your patients, including:
  (1.) The providing or dispensing of food, beverages, medications or medical supplies or appliances in connection with such services; and
  (2.) The handling or treatment of dead bodies, including autopsies, organ donation or other procedures.
b. Arising out of the services by any person as a:
  (1.) Member of a formal accreditation, standards review or equivelant professional board or committee of the Named Insured; or
  (2.) Person charged with executing the directives of such board or committee.
c. "Medical Incident" does not include injury arising out of the retention of a resident in an insured's facility when that resident required a level of care higher than that which the insured was permitted by state and/or federal licensing authorities to provide, nor to injury arising out of an insured having provided a resident with a level of care for which it was not licensed by the appropriate state or federal licensing authorities.

And the CGL portion of the policy defines an occurrence as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

9

It is undisputed that Marshall made a phone call to Carmona about Bishop's death shortly after the July 2012 incident. Marshall advised Carmona that several agencies were investigating and at least one had inquired whether J&S maintained the required coverage in accordance with Florida law. The trial court concluded that Marshall's phone call to Carmona constituted a claim—not just notice of an injury or occurrence—under the 2012 policy. The trial court also concluded in the alternative that the investigating agencies' demand for proof of insurance coverage from J&S in November 2012 amounted to a claim "on behalf of the injured person" under the PL policy. This was error.

The agency investigations into Bishop's death do not qualify as a "claim" or "suit" because they were not initiated on behalf of Bishop or his Estate. And based on the policy's definitions of what constitutes a claim, although Marshall's phone call to Carmona qualified as notice of an injury or occurrence that might lead to a claim against the insured, it was not a claim made under the 2012 policy. Instead, there was no claim—a suit or demand for monetary damages—made on behalf of the injured person until 2014, when the Estate filed a wrongful death suit against J&S. This is true even if the December 2012 letters retroactively cancelling the 2012 policy are ignored. The 2012 policy was still set to expire in early 2013—over a year before the Estate made any claim.

*Abandoned Claims Against the 2013 and 2014 Policies*

We briefly address the Estate's abandoned counts seeking relief under the 2013 and 2014 policies. Had the 2012 policy not been cancelled for non-payment of premiums or had J&S timely secured the renewal policy in 2013, J&S would have had the ability to purchase supplemental extended discovery coverage extending the period for reporting claims under its 2013 and 2014 policies to cover the 2012 incident involving Bishop. *See U.S. Fire Ins. Co. v. Fleekop*, 682 So. 2d 620, 623 (Fla. 3d DCA 1996) ("Tail coverage picks up where the claims-made policy leaves off, with respect to acts committed during the original policy period. Tail coverage does not provide indemnity for new negligent acts or omissions committed during the tail period.").

10

Here, NALRRG sent a renewal letter in November 2012, advising J&S that if NALRRG did not receive J&S's application and renewal premium payment before January 13, 2013, coverage would lapse and J&S would then "have no coverage for claims resulting from an injury or incident which occurred after the expiration date." There is no evidence that Marshall ever tried to contact NALRRG or Carmona to renew the policy within the required period. Instead, the record evidence shows that J&S did not pay its renewal premium and secure coverage again until March 8, 2013—which, due to the lapse in coverage, became the new retroactive date under the 2013 policy. Put differently, the 2013 policy allowed for claims to be made under that policy only for injuries or occurrences that happened on or after March 8, 2013. Had J&S timely renewed its policy under the terms offered by NALRRG, it would have been able to secure extended discovery coverage for injuries or occurrences that happened during the 2012 policy period.

J&S also received two cancellation notices for the 2012 policy and never contacted Carmona nor NALRGG about the cancellation of the insurance coverage it was required to maintain under Florida law.[3] On December 13, 2012, NALRRG sent two letters to J&S notifying it of the retroactive cancellation of the 2012 policy. The first notice stated that an extended discovery period could be purchased for an additional premium before October 30, 2012, and the second notice stated that it could be purchased before February 11, 2013. As the deadline to purchase extended discovery coverage had expired in one notice, it is likely that the notice was issued in error. In any event, there is no indication in the record that J&S ever tried to purchase extended discovery coverage. And there is

---

[3] The record shows that Marshall, as J&S's manager, was familiar with cancellation notices based on past failures to pay his premiums. Marshall admitted during his deposition that J&S had received a notice of cancellation for non-payment of premiums a year before Bishop died. And the record shows that J&S received yet another notice of cancellation for failure to pay its premiums in 2014.

11

no record evidence that J&S ever contacted Carmona or NALRRG to dispute the cancellation of the 2012 policy for non-payment.[4]

And so, even if, as the trial court found, NALRRG failed to properly cancel the 2012 policy, this would not resolve the coverage issue here. Regardless of whether the policy was cancelled for non-payment, the 2012 policy expired on January 13, 2013. And therefore, the 2014 claim made for the wrongful death lawsuit fell outside the period covered by the 2012 policy.

Whether coverage might have been available under the 2014 policy under an estoppel or reformation of contract theory, we do not reach. In their second amended complaint, the Estate alleged counts seeking to reform the 2013 and 2014 policies to extend the retroactive periods for reporting incidents and to estop NALRRG from cancelling the 2012 policy and enforcing the retroactive date in the 2013 and 2014 policies. But after NALRGG pointed out that the Estate failed to seek an assignment of J&S's and Marshall's rights under the 2013 and 2014 policies, the Estate voluntarily dismissed those counts with prejudice.

*Conclusion*

The only policy at issue in the proceedings supplementary was the 2012 policy. And under the plain terms of that policy, no lawsuit or demand for damages stemming from Bishop's injuries

---

[4] Relevant here to the Estate's rights and interests, an assignment of rights "transfers to the assignee only the interest and rights of the assignor" at the time of the assignment, and "the assignee stands in the shoes of the assignor." *Allen v. Helms*, 293 So. 3d 572, 580 (Fla. 1st DCA 2020); *see also* § 68.06, Fla. Stat. ("The assignment or endorsement of any instrument vests the assignee or endorsee with the same rights, powers, and capacities as were possessed by the assignor or endorser."). Thus, the Estate's ability to collect under the insurance policy is constrained by J&S's failure to timely renew its policy and therefore maintain continuous coverage.

or on behalf of Bishop was made until 2014. Based on the evidence presented below, the trial court reversibly erred when it concluded that Marshall's phone call to Carmona shortly after Bishop's death in 2012 constituted a claim made under the 2012 insurance policy. It also erred when it concluded that requests concerning the existence of insurance coverage made by regulatory agencies during their investigations amounted to a claim made on behalf of Bishop's Estate. We, therefore, REVERSE the final judgment entered for the Estate.

OSTERHAUS, C.J., and NORDBY, J., concur.

———————————————

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

———————————————

Elizabeth J. Campbell of the Law Offices of Elizabeth J. Campbell, LLC, Atlanta, GA; and Dorothy DiFiore of Quintairos, Prieto, Wood & Boyer, P.A., Tampa, for Appellant.

Mark A. Boyle and Thomas E. Shepard of Boyle, Leonard & Anderson, P.A., Fort Myers; and Joshua A. Woolsey of Woolsey Morcom, Ponte Verde Beach, for Appellees.